# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

FABIAN PERRONE and CHIA-HUNG KAO :

              Plaintiff(s),      :

      vs.                   :

ALBERTO BENBASSAT, STÉPHANE
BENBASSAT, GERALD J.P. BRADY,
NICOLA A. CORSETTI, NIGEL H.
FIELDING, HELMUTH E. FREY, JOHN
HOLLIWELL, KARL E. KANIAK, SONJA
KOHN, ALBERTO LA ROCCA, DANIEL
MORRISSEY, FRANCO MUGNAI,
DECLAN MURRAY, HERALD C.
NOGRASEK, JAMES. E. O'NEILL,
FRIEDRICH PFEFFER, URSULA RADEL-
LESZCZYNSKI, HANNES SALETA, PETER
SCHEITHAUER, ALFRED SIMON, DAVID
T. SMITH, JOHANNES P. SPALEK,
WERNER TRIPOLT, MICHAEL
WHEATON, BA WORLDWIDE FUND
MANAGEMENT, LTD, BANK AUSTRIA
CREDITANSTALT, BANK OF BERMUDA
(CAYMAN) LIMITED, BANK OF
BERMUDA (LUXEMBOURG) S.A., BANK
MEDICI AG, ERNST & YOUNG, PRIMEO
FUND, HERALD FUND SPC, HSBC
HOLDINGS PLC, HSBC INSTITUTIONAL
TRUST SERVICES (IRELAND) LTD., HSBC
SECURITIES SERVICES (IRELAND) LTD.,
HSBC SECURITIES SERVICES
(LUXEMBURG) S.A., PIONEER
ALTERNATIVE INVESTMENT
MANAGEMENT LIMITED,
PRICEWATERHOUSECOOPERS, THEMA
INTERNATIONAL FUND PLC, and
UNICREDIT S.A.,

            Defendant(s).   :

——————————————————— x

Civil Action No. 09-cv-2558

"ECF Case"

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      This is a class action on behalf of all persons or entities who purchased shares of the Thema Fund (a sub fund of Thema International Fund plc), Primeo Select Fund, Primeo Executive Fund (sub funds of the Primeo Fund), Herald USA Fund and/or Herald Luxemburg Fund (together the "Herald Funds") (collectively "the Medici Funds") between January 1, 2004 and December 10, 2008, for the federal law claims alleged herein, and March 1, 2001 and December 10, 2008, for the state claims alleged herein, inclusive, (the "Class Periods") and were damaged thereby (the "Class"). Excluded from the Class are the defendants, any entity in which defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

2.      Plaintiffs brings claims against some or all defendants for violations of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, negligent misrepresentation, breach of fiduciary duty, violation of General Business Law §349, gross negligence, unjust enrichment, and aiding and abetting breach of fiduciary duty.

3.      This action arises from defendants' wrongful conduct in connection with the fraud and Ponzi scheme run by Bernard L. Madoff ("Madoff") through his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS"). On December 11, 2008, Madoff's Ponzi scheme was disclosed to the public and Madoff was arrested by federal authorities. Madoff and BMIS had fraudulently reported steady, positive returns on billions of dollars in investments they controlled when, in fact, they had lost most, if not all, of the investors' money in the largest Ponzi scheme in financial history. In fact, the government now says that it appears Madoff did not invest *any* of the money sent to him for over thirteen years. The U.S. Government has filed criminal charges against Madoff and the SEC is investigating BMIS and related entities. Investors' losses are estimated at $50 billion.

4.     Following these revelations, a number of investment funds disclosed that they were little more than feeder funds for Madoff and BMIS.  Such funds included the Medici Funds.  The Medici Funds each sought contributions directly from investors, and delivered, or fed, the investments they received to Madoff.  Bank Medici AG ("Medici"), controlled the Medici Funds, and caused these funds to be fed into Madoff's Ponzi scheme.  Sonja Kohn, the founder of Medici, its chairperson, and a 75% owner, Peter Scheithauer ("Scheithauer") the former Chief Executive Officer ("CEO") of Medici, Werner Tripolt a former director of Medici, John Holliwell ("Holliwell") another director of Medici, UniCredit S.A. ("UniCredit"), an Italian bank which owned 25% of Medici through its subsidiary Bank Austria Creditanstalt ("Bank Austria"), Bank Austria itself (collectively the "Medici Defendants") were all control persons of Medici.

5.     The Medici Defendants, and Pioneer Alternative Investments ("Pioneer") (collectively the "Fund Managers"), who at all relevant times was owned by Unicredit and owned the Primeo Fund, represented to investors that their money would be invested in the securities market.  The Fund Managers touted profits made by current investors, thereby encouraging investment by new and existing investors.  However, the Fund Managers did **not** inform their investors that the Medici Funds were acting as feeder funds for a Ponzi scheme.

6.     Equally, defendants the Herald Fund Directors, Primeo Fund Directors, and Thema Fund Directors, along with the Medici Funds' advisers, administrators, managers and custodians, as defined *infra*, were control persons of their respective funds and misled investors by failing to inform them that they were investing in Madoff's Ponzi scheme through feeder funds.

7.     Defendant Ernst & Young ("E&Y") was the auditor for the Herald and Primeo Funds and Defendant PricewaterhouseCoopers ("PwC") was the auditor for the Thema Fund (collectively the "Auditor Defendants").  The Auditor Defendants falsely represented to plaintiffs and the Class

that their investments were secure and gaining value.  The Auditor Defendants ignored or failed to do reasonable due diligence to uncover the many red flags which would have shown that these funds were not safe and growing, but were instead invested in a Ponzi scheme.

8.      Moreover, all the defendants ignored many red flags that should have caused them, as investment professionals, to conduct further due diligence and/or alter their investment decisions. These red flags included but were not limited to the following:

(a)      the lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

(b)      BMIS's returns lacked the usual level of volatility, including only five months of negative returns in the past 12 years;

(c)      the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns comparable to those generated by Madoff;

(d)      Madoff acted as his own prime broker, while most hedge funds use outside large banks as their prime brokers;

(e)      BMIS only generated revenue through transaction-based commission fees, unlike most hedge funds which charge investment management fees based on the performance of the fund;

(f)      account statements sent to Madoff's investors did not support the returns they reported;

(g)      one of Madoff's competitors, Harry Markopolos, sent two letters to the SEC, one in 1999 claiming that "Madoff Securities is the world's largest Ponzi Scheme" and another in 2005 stating "The World's Largest Hedge Fund is a Fraud;"

(h)     BMIS's auditor, Freihling & Horowitz, consisted of one office in Rockland County, New York, with three employees, one of whom was 78 years old and lived in Florida, and one of whom was a secretary;

(i)     regulatory filings of the Medici Funds showed very small positions in equities, which the Medici Funds explained was due to Madoff's strategy of converting all the assets to case equivalents at the end of every quarter, but there was no record of the estimated $13 billion in assets being moved all at once; and

(j)     BMIS's comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers.

9.     As a result of defendants' wrongdoing, plaintiffs unknowingly invested in a Ponzi scheme indirectly through one of the Medici Funds known as the Thema Fund.  The vast majority of the capital of the Thema Fund was invested with Madoff and his related entities.  Due to defendants' actions, plaintiffs have lost their investments in the Thema Fund and Class members who invested in the Medici Funds have lost over $3 billion.

10.     By contrast, defendants have received millions of dollars in commissions and fees throughout the Class Periods.

### JURISDICTION AND VENUE

11.     This Court has jurisdiction over the Exchange Act claims asserted herein pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

12.     This Court also has jurisdiction over the claims pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332(a).

13.     This Court additionally has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2).  With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount, (ii) the Class consists of hundreds, and perhaps thousands, of

individuals, and (iii) the plaintiffs are citizens of a foreign state and one defendant is a citizen of New York.

14.     Venue in this judicial District is proper pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28U.S.C. §1391(b), because substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.  Additionally, certain of the defendants maintain offices and conduct substantial business in this District.

## THE PARTIES

15.     Plaintiff  Fabian Perrone is, and was at all times relevant hereto, a resident of Argentina.  As indicated in the attached certification, during the Class Periods  Mr. Perrone purchased securities in the Thema Fund which was controlled by the Medici Defendants, Thema Director Defendants, Thema Administrator, and Thema Custodian (defined *infra*).  Due to the activities alleged herein, Plaintiff has lost all, or substantially all, of his investments in the Thema Fund, and has paid fees for illusory services.  Plaintiffs invested in the Thema Fund in United States Dollars.

16.     Plaintiff Chia-Hung Kao is, and was at all times relevant hereto, a resident of Taiwan. As indicated in the attached certification, during the Class Period Mr. Kao purchased securities in the Primeo Fund which was controlled by the Medici Defendants, Primeo Director Defendants, Pioneer Alternative Investments, Primeo Manager, Primeo Adviser Defendants, Primeo Administrator, First Primeo Custodian, Second Primeo Custodian, Bank Bermuda Limited, and HSBC Holdings plc (defined *infra*).  Due to the activities alleged herein, Plaintiff has lost all, or substantially all, of its investment in the Primeo Fund, and has paid fees for illusory services.  Mr. Kao invested in the Primeo Fund in United States dollars.

17.     Plaintiff Perrone and Plaintiff Kao are collectively referred to as "Plaintiffs."

- 5 -

18.     Defendant Medici is a closely held merchant bank based in Vienna, Austria with offices located in New York, Milan, Gibraltar, and Zurich.  Medici was incorporated in Austria on March 9, 1994, and was granted a full banking license by the Austrian Financial Authority on December 3, 2003.  Defendant Kohn at all relevant times controlled 75% of Medici.  Bank Austria, which is owned by Defendant UniCredit, at all relevant times held the remaining 25%.  Medici, at all relevant times, owned, acted as investment manager for, and marketed the Herald Funds, controlled the Primeo Fund, through Unicredit's subsidiary Pioneer, was the manager of the Thelma Fund beginning in 2006, and caused each of these to become feeder funds for Madoff's Ponzi scheme.  Over $3 billion in the Medici Funds have been lost in the Madoff Ponzi scheme.  Today, Medici's management is being overseen by the Austrian government following Austria's launch of a probe, on January 15, 2009, into Medici's actions.  Upon information and belief, Medici transacted business in the United States related to the claims alleged herein.

19.     Defendant Kohn is the founder of Medici, its chairperson, and a 75% owner.  At all relevant times Kohn was aware, but did not share with Plaintiffs or other investors, that defendants were purchasing shares in feeder funds for Madoff's Ponzi scheme.  Kohn was a control person of Medici.  Upon information and belief, Kohn transacted business in the United States related to the claims alleged herein.

20.     Defendant Scheithauer was the CEO of Medici.  Scheithauer resigned as CEO of Medici on January 2, 2009.  Scheithauer was a control person of Medici.  Upon information and belief, Scheithauer transacted business in the United States related to the claims alleged herein.

21.     Defendant Tripolt was a director of Medici.  Tripolt resigned from the board on January 2, 2009.  Tripolt was a control person of Medici.  Upon information and belief, Tripolt transacted business in the United States related to the claims alleged herein.

22.     Defendant Holliwell was a director of Medici.  Holliwell was a control person of Medici.  Upon information and belief, Holliwell transacted business in the United States related to the claims alleged herein.

23.     Defendant UniCredit, at all relevant times, was an Italian bank which owned 25% of Medici through its subsidiary Austria Bank.  UniCredit's stake in Medici had a book value of €1.5 million in December 2008.  UniCredit was a control person of Medici.  UniCredit provided Medici with access to its subsidiary Pioneer's Primeo Funds.  Unicredit acquired Pioneer in 2000 and grew assets to $72 billion by the end of 2007.  At all relevant times, UniCredit was a control person of Pioneer.   Pioneer's Dublin-based Alternative Investments division paid Medici commissions of €835,000 in 2007 for referring investors.  Almost all of Pioneer's Primeo Select Fund was invested with Madoff.  The fund's assets were reported as $280 million.  Upon information and belief, UniCredit transacted business in the United States related to the claims alleged herein.

24.     Defendant Bank Austria, at all relevant times, owned 25% of Medici and was a control person of Medici.  Bank Austria is Austria's largest bank and was, at all relevant times, a subsidiary of UniCredit.  Bank Austria was also a sponsor of the Primeo Fund.  Upon information and belief, Bank Austria transacted business in the United States related to the claims alleged herein.

25.     The Medici Defendants were control persons of Medici and the Medici Funds.

26.     Defendant Herald Funds were at all relevant times were investment funds created and sold by Medici.  Unknown to investors, 100% of the Herald Funds were invested in Madoff's Ponzi scheme.  The Herald USA Fund was started in 2004, and the Herald Luxembourg Fund was started in March of 2008.  Together, the Herald Funds' exposure to Madoff is approximately $2.1 billion.

27.     Defendant Helmuth E. Frey was the Chairman of the Board of the Herald Luxembourg Fund.  Frey is also a former CEO of Investment Bank Austria AG.  Upon information and belief, Frey transacted business in the United States related to the claims alleged herein.

28.     Defendant Friedrich Pfeffer was a director of Herald Luxembourg Fund.  Upon information and belief, Pfeffer transacted business in the United States related to the claims alleged herein.

29.     Defendant Franco Mugnai was a director of Herald Luxembourg Fund.  Upon information and belief, Mugnai transacted business in the United States related to the claims alleged herein.

30.     Defendants Frey, Pfeffer, and Mugnai are collectively referred to as the "Herald Luxembourg Director Defendants."  The Herald Luxembourg Director Defendants were control persons of Herald Luxembourg Fund.

31.     Defendant HSBC Securities Services (Luxemburg) S.A. ("Herald Funds Administrator/Custodian" or "Second Primeo Custodian") was the custodian, service agent and listing agent of the Herald Funds and custodian for the Primeo Fund.  This defendant is located at 40 avenue Monterey, P.O. Box 413, L-2014 Luxemburg.  As the Herald Funds Administrator/Custodian it had responsibility for the administering the Herald Funds, including the calculation of Net Asset Value ("NAV"), preparing of the accounts, and providing safe custody for, and control of, the Herald Fund's assets it held.  The Herald Funds Administrator/Custodian is an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England and traded on the New York Stock Exchange.  The Herald Funds Administrator/Custodian was a control person of the Herald Funds.  As the Second Primeo Custodian, this defendant was also a control person of the

Primeo Fund.  Upon information and belief, this defendant transacted business in the United States related to the claims alleged herein.

32.     Defendant Pioneer Alternative Investments ("Pioneer") was owned at all relevant times by Unicredit.  Pioneer at all relevant times owned and was a control person of the Primeo Fund.  As of June 30, 2008, Pioneer managed over €6 billion in assets.  On January 12, 2009, a spokesman for Pioneer said Pioneer's total Madoff exposure, mainly through the Primeo Fund, was $1.1 billion.  Upon information and belief, Pioneer transacted business in the United States related to the claims alleged herein.

33.     Defendant Primeo Fund and its sub-funds the Primeo Select Fund and Primeo Executive Fund were at all relevant times owned by Pioneer.  Primeo Fund was, at all relevant times, controlled by the Medici Defendants and Pioneer and invested with Madoff.  The Primeo Fund is an open-ended investment fund organized under the laws of the Cayman Islands on November 17, 1993.  The registered office of the Fund is located c/o Bank of Bermuda (Cayman) Limited, P.O. Box 513, GT, HSBC House, 68 West Bay Road, Grand Cayman, Cayman Islands.  The Primeo Fund commenced operations on January 1, 1994.  Upon information and belief, Primeo Fund transacted business in the United States related to the claims alleged herein.

34.     Defendant Alfred Simon was President and CEO of the Primeo Fund for a portion of the Class Period.  Additionally, since 1999, Simon has been General Manager of The Financial Products Department of Bank Austria in Vienna.  Upon information and belief, Simon transacted business in the United States related to the claims alleged herein.

35.     Defendant Karl E. Kaniak was a director of the Primeo Fund for a portion of the Class Period.  Kaniak was also affiliated with Bank Austria in various capacities from at least 1991-1998.

Upon information and belief, Kaniak transacted business in the United States related to the claims alleged herein.

36.   Defendant Johannes P. Spalek was a director of the Primeo Fund for a portion of the Class Period.  Upon information and belief, Spalek transacted business in the United States related to the claims alleged herein.

37.   Defendant Nigel H. Fielding was a director of the Primeo Fund for a portion of the Class Period.  From 1999 to at least 2004, Fielding was also General Manager in Global Fund Services for Bank of Bermuda (Luxembourg) S.A., the Primeo Fund's custodian.  Upon information and belief, Fielding transacted business in the United States related to the claims alleged herein.

38.   Defendant James. E. O'Neill was a director of the Primeo Fund for a portion of the Class Period and its adviser BA Worldwide Fund Management, LTD.  O'Neill was also a Managing Director of Bank Austria Cayman Islands Limited, Grand Cayman, Cayman Islands BWI from 1998 to at least 2004.  O'Neill is a citizen of the United States.  Upon information and belief, O'Neill transacted business in the United States related to the claims alleged herein.

39.   Defendant Alberto La Rocca was a director of the Primeo Fund for a portion of the Class Period.  La Rocca was also a Managing Director of Pioneer Alternative Investment Management (Bermuda) Limited from at least December 2002 through April 25, 2007; director of Pioneer Global Asset Management Limited, S.p.A. from at least November 2003 through April 25, 2007; and Chief Executive Officer of Pioneer Alternative Investment Management Limited from at least 1998 through April 25, 2007.  Upon information and belief, La Rocca transacted business in the United States related to the claims alleged herein.

40.   Defendant Declan Murray was a director of the Primeo Fund for a portion of the Class Period.  Murray was also Chief Executive Officer of Pioneer Alternative Investment

Management Limited from at least 1999 through April 25, 2007 and employed with E&Y from 1987 to 1991.  Upon information and belief, Murray transacted business in the United States related to the claims alleged herein.

41.     Defendant Ursula Radel-Leszczynski was a director of the Primeo Fund for a portion of the Class Period.  Radel was also President of a Bank Austria subsidiary from at least February 200 through April 25, 2007 and has been with Bank Austria since 1995.  Upon information and belief, Radel transacted business in the United States related to the claims alleged herein.

42.     Defendant Michael Wheaton was a director of the Primeo Fund for a portion of the Class Period.  Wheaton resigned from the board on June 30, 2008.  Upon information and belief, Wheaton transacted business in the United States related to the claims alleged herein.

43.     Defendants Simon, Kaniak, Spalek, Fielding, O'Neill, LaRocca, Murray, Radel, and Wheaton are collectively referred to as the "Primeo Director Defendants."  The Primeo Director Defendants were control persons of the Primeo Fund.

44.     Defendant Pioneer Alternative Investment Management Limited ("Primeo Manager") was an investment manager based in Dublin, Ireland, appointed by the Primeo Fund to assist the Primeo Fund in choosing, on behalf of Primeo Select, which managers or their funds to invest in. The Primeo manager also became an adviser for the Primeo Fund beginning on April 25, 2007. Upon information and belief, the Primeo Manager transacted business in the United States related to the claims alleged herein.

45.     Defendant BA Worldwide Fund Management, LTD ("Primeo Adviser") was the investment adviser for the Primeo Fund prior to April 25, 2007.  The Primeo Adviser is located at c/o HWR Services P.O. Box 71, Road Town, Tortola, B.V.I.  According to the Primeo Fund's 2004 Offering Memoranda, the Primeo Adviser was charged with supervising the selection of investment

companies and managers with the help of Bank Austria and then monitoring the underlying portfolio of the investment companies and managers.  Upon information and belief, the Primeo Adviser transacted business in the United States related to the claims alleged herein.

46.     Defendant Herald C. Nograsek is a director of the Primeo Adviser.  From 1991 to at least 2004, Nograsek has also been affiliated in various capacities with Bank Austria.  Upon information and belief, Nograsek transacted business in the United States related to the claims alleged herein.

47.     Defendant Hannes Saleta is a director of the Primeo Adviser.  From 1991 to at least 2004, Saleta has also been working for the board of directors of Bank Austria.  Upon information and belief, Saleta transacted business in the United States related to the claims alleged herein.

48.      Defendant Nicola A. Corsetti is a director of the Primeo Adviser.  From 2000 to at least 2004, Corsetti was also a Manager of Treasury and Risk Management at Bank Austria Cayman Islands Ltd.  Corsetti is a citizen of the United States.  Upon information and belief, Corsetti transacted business in the United States related to the claims alleged herein.

49.     Defendants the Primeo Manager, the Primeo Adviser, O'Neill, Nograsek, Saleta, and Corsetti are collectively referred to as the "Primeo Adviser Defendants."  The Primeo Adviser Defendants were control persons of the Primeo Fund.

50.     Defendant Bank of Bermuda (Cayman) Limited ("Primeo Adminstrator") was the administrator and registrar of the Primeo Fund.  The Primeo Administrator is located at P.O. Box 513, GT, HSBC House, 68 West Bay Road, Grand Cayman, Cayman Islands.  The Primeo Administrator had responsibility for (i) maintaining corporate and financial books and records of the Primeo Fund, (ii) providing the Primeo Fund with periodic reports regarding its account and preparing annual financial statements for the Primeo Fund, (iii) computing NAV on a monthly basis,

(iv) providing registrar and transfer agent services, (v) attending to certain non-discretionary details in connection with the sale, purchase, transfer and other dealings with the securities, debt instruments and other property of the Primeo Fund held by it, (vi) performing certain accounting and clerical services necessary in connection with the administration of the Primeo Fund, and (vii) serving as corporate secretary. The Primeo Administrator was a corporation organized and licensed under the laws of the British Virgin Islands. The Primeo Administrator is a wholly owned subsidiary of Bank of Bermuda Limited and 95% of the Primeo Administrator is indirectly owned by Bank Austria. The Primeo Administrator was a control person of the Primeo Fund. Upon information and belief, the Primeo Administrator transacted business in the United States related to the claims alleged herein.

51.     Defendant Bank of Bermuda (Luxembourg) S.A. ("First Primeo Custodian") was the custodian of the Primeo Fund for a portion of the relevant period, and purportedly sought to provide safe custody for, and control of, the Primeo Fund's assets it held. The Primeo Custodian is a wholly owned subsidiary of Bank of Bermuda Limited. The Primeo Custodian was a control person of the Primeo Fund. Upon information and belief, the Primeo Custodian transacted business in the United States related to the claims alleged herein.

52.     Defendant Bank Bermuda Limited is the parent company of and wholly owns both the Primeo Administrator and First Primeo Custodian. Bank Bermuda Limited was a control person of the Primeo Fund. On February 18, 2004, Bank Bermuda Limited became an indirect wholly-owned subsidiary of HSBC Holdings Plc. Upon information and belief, Bank Bermuda Limited transacted business in the United States related to the claims alleged herein.

53.     Defendant Herald Fund SPC ("Herald SPC") is an exempted segregated portfolio company incorporated in the Cayman Islands and registered as a regulated mutual fund under

Cayman Islands law, which is managed by Herald Asset Management. Primeo Select invested in the investment fund of Hearld SPC. Herald SPC selected BMIS as sub-manager to manage the assets of its fund. Hearld SPC was a control person of the Primeo Fund. Upon information and belief, Herald SPC transacted business in the United States related to the claims alleged herein.

54.     Defendant Ernst & Young ("E&Y") at all relevant times was the auditor for the Herald and Primeo Funds. E&Y provides auditing services worldwide and one of the "Big Four" auditing firms. Here, E&Y failed to perform its annual audits of the financial statements and financial condition of the Herald and Primeo Funds in accordance with professional standards applicable to those audits. The E&Y office that audited the Herald Funds is located at 7, Parc d'Activité Syrdall, L-5365 Munsbach, Luxembourg. The E&Y office that audited the Primeo Fund is located at Public Accountants P.O. Box 510, George Town, Grand Cayman, Cayman Islands, B.V.I. Upon information and belief, E&Y transacted business in the United States related to the claims alleged herein.

55.     Defendant Thema International Fund plc, ("Thema Fund") is located at HSBC House, Harcourt Street, Dublin 2, Ireland. According to the Thema Fund's financials, "the Company is an umbrella type open-ended investment company with variable capital incorporated in Ireland as a public limited company . . . and qualifying as a UCITS . . . . There is . . . one sub-fund, the Thema Fund . . . ." The sub-fund had two share classes, one in United States Dollars and the other in Euros. As of November 28, 2008, the Thema Fund was said to have assets of over $1 billion all of which were invested with Madoff. At all relevant times, the Thema Fund was controlled by the Medici Defendants and invested with Madoff. Upon information and belief, the Thema Fund transacted business in the United States related to the claims alleged herein.

56.     Defendant Alberto Benbassat is a director of the Thema Fund.  Upon information and belief, Alberto Benbassat transacted business in the United States related to the claims alleged herein.

57.     Defendant Stéphane Benbassat is a director of the Thema Fund.  Upon information and belief, Stéphane Benbassat transacted business in the United States related to the claims alleged herein.

58.     Defendant Gerald J.P. Brady is a director of the Thema Fund.  Brady is a resident of Ireland.  Upon information and belief, Brady transacted business in the United States related to the claims alleged herein.

59.     Defendant Daniel Morrissey is a director of the Thema Fund.  Morrissey is a resident of Ireland.  Upon information and belief, Morrissey transacted business in the United States related to the claims alleged herein.

60.     Defendant David T. Smith is a director of the Thema Fund.  Upon information and belief, Smith transacted business in the United States related to the claims alleged herein.

61.     Defendants Alberto Benbassat, Stéphane Benbassat, Brady, Morrissey, and Smith are collectively referred to as the "Thema Director Defendants."  The Thema Director Defendants were control persons of the Thema Fund.

62.     Defendant HSBC Securities Services (Ireland) Ltd. (the "Thema Administrator") was the administrator, registrar, transfer agent, and secretary of the Thema Fund.  The Thema Administrator had responsibility for the administration of the Thema Fund, including the calculation of NAV and preparation of the accounts.  The Thema Administrator is an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England.  The Thema

Administrator was a control person of the Thema Fund.  Upon information and belief, the Thema Administrator transacted business in the United States related to the claims alleged herein.

63.     Defendant HSBC Institutional Trust Services (Ireland) Ltd. (the "Thema Custodian"), f/k/a Bermuda Trust (Dublin) Limited, was the custodian of the Thema Fund and purportedly sought to provide safe custody for, and control of, the Thema Fund's assets it held.  The Thema Custodian is an indirect wholly-owned subsidiary of HSBC Holdings plc.  The Thema Custodian was a control person of the Thema Fund.  Upon information and belief, the Thema Custodian transacted business in the United States related to the claims alleged herein.

64.     Defendant HSBC Holdings plc ("HSBC") was, at all relevant times, parent company to its wholly-owned subsidiaries, the Thema Administrator-Thema Custodian and Bank Bermuda Limited.  HSBC was a control person of the Thema Fund and Primeo Fund.  Upon information and belief, HSBC transacted business in the United States related to the claims alleged herein.

65.     Defendant PwC served as the auditor for the Thema Fund.  PwC's Dublin, Ireland, office performed the auditing work for the Thema Fund.  PwC provides auditing services worldwide, is the largest professional services firm in Ireland, and one of the "Big Four" auditing firms.  Here, PwC failed to perform its audits of the Thema Fund's prospectuses and annual financial statements and financial condition of the Thema Fund in accordance with professional standards applicable to those audits.  PwC's Dublin office is located at One Spencer Dock, North Wall Quay, Dublin 1, Ireland.  Upon information and belief, PwC transacted business in the United States related to the claims alleged herein.

66.     Each defendant had a duty to the Class members to use and manage their investment funds with due care, and to disseminate accurate and truthful information with respect to the use and management of such funds.

67.     Each defendant participated in the Ponzi scheme complained of herein and/or was aware of, and/or recklessly and/or negligently disregarded, the misuse and mismanagement of investment funds belonging to plaintiffs and the Class, and/or was aware of, and/or recklessly and/or negligently disregarded, the material misstatements or omissions associated with the Ponzi scheme alleged herein.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

68.     Defendants have affirmatively and fraudulently concealed their unlawful scheme and course of conduct from Plaintiffs and the Class through an elaborate scheme of affirmative acts including concealing that defendants were feeding money belonging to Plaintiffs and the Class into a massive Ponzi scheme.

69.     Despite exercising reasonable diligence, Plaintiffs and the Class could not discover and were prevented from discovering defendants' improper actions described herein.  As fiduciaries to Plaintiffs and the Class, defendants owed them an affirmative duty to full and fair disclosure but failed to honor and discharge that duty.  Rather than ensure truthful disclosure of all material facts, defendants concealed such material facts relating to the deceptive and unlawful conduct alleged herein.

70.     The running of the statute of limitations has been suspended and did not accrue until Plaintiffs and the Class discovered defendants' deception, or was equitably tolled with respect to any state law claims that Plaintiffs and the Class have brought or could bring as a result of the fraudulent concealment and course of conduct alleged herein.   Defendants, through various devices of misrepresentation and secrecy as alleged herein, affirmatively and fraudulently concealed the truth about where Plaintiff's and the Class' money was going.  Plaintiffs and the Class had no knowledge of defendants' illicit activities, schemes and unlawful conduct, or of any of the facts that might have

- 17 -

led to earlier discovery of the wrongdoing, and could not reasonably have obtained such an advanced level of expert knowledge even through diligent effort, before filing suit.

71.     Plaintiffs and the Class had no knowledge of defendants' fraudulent scheme and could not have discovered that its representations were false or that defendants had concealed information and materials from Plaintiffs and the Class until shortly before the filing of this Complaint.

72.     Accordingly, any applicable statute of limitations has been tolled with respect to any state law claims that Plaintiffs and the Class have brought as a result of the unlawful and fraudulent conduct alleged herein.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).  The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds and perhaps thousands.

74.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of all Class members, and Plaintiffs do not have interests antagonistic to, or in conflict with, those of the Class.  In addition, Plaintiffs have retained competent counsel experienced in class action securities litigation.

75.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the common law.

76.     There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

(a)      Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      Whether defendants were negligent in failing to adequately investigate Madoff and BMIS;

(c)      Whether statements made by defendants to Plaintiffs and the Class were false and misleading and misrepresented material facts about the Medici Funds;

(d)      Whether defendants acted knowingly, recklessly, or negligently in making materially false and misleading statements during the Class Periods;

(e)      Whether defendants' conduct alleged herein was intentional, reckless, grossly negligent, or negligent in violation of fiduciary duties owed to Plaintiffs and the Class and, therefore, in violation of the common law; and

(f)      Whether and to what extent Plaintiffs and the Class were damaged.

77.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments.  Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## DEFENDANTS' MISCONDUCT

78.      During the Class Periods Defendants made false and misleading statements and omissions to Plaintiffs and the Class in prospectuses (and associated supplements) and offering memoranda for the Medici Funds.  The following are a sampling of those misrepresentations which damaged Plaintiffs and the Class.

79. The Primeo Fund issued an Offering Memorandum in February 2004 (the "2004 Primeo Memorandum"). The 2004 Primeo Memorandum omits any mention of the Primeo Fund's investment in Madoff and includes false and misleading statements including but not limited to:

(a) "The Directors of the Fund whose names appear under 'Directors and Officers,' accept responsibility for the information contained in this Offering Memorandum. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information."

(b) "The investment objective of the Fund (defined below) is long-term capital appreciation through diversification of investments." "The investment objective of the Primeo Select Fund is to invest in liquid U.S. equity securities and index options seeking long-term capital appreciation."

(c) "For the Primeo Select Fund Shareholders, the Fund intends to achieve the objective of long-term capital appreciation by investing primarily in United States listed equity securities that are liquid, including those listed in the Standard & Poor's 500 Index and in index options."

(d) "The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers."

80. On April 25, 2007 the Primeo Fund issued an Offering Memorandum for its Primeo Select and Primeo Executive sub funds (the "2007 Primeo Memorandum"). The 2007 Primeo Memorandum omits any mention of the Primeo Fund's investment in Madoff and includes false and misleading statements including but not limited to:

(a)   "The Directors of the Fund (with the exception of the non-executive Directors), whose names appear under the section headed 'Directors and Other Parties,' accept responsibility for the information contained in this Offering Memorandum.  To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information."

(b)   "The Select Fund aims to achieve the goal of long term capital growth.  For Select Fund Shareholders, the Fund intends to achieve the objective of a long-term capital growth . . ."

(c)   "The Executive Fund aims to achieve the goal of long term capital growth. For Executive Fund Shareholders, the Fund intends to achieve the objective of long-term capital growth . . ."

(d)   "The Sub-Manager invests primarily in the United States and utilizes a non-traditional strategy that is a variation of the traditional 'option conversion' strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares).  The strategy utilized by the Sub-Manager is called 'split-strike conversion' and entails:

(i)   purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;

(ii)          selling out-of-the-money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and

(iii)          purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount."

(e)          "In structuring the portfolio for the Select Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility."

(f)          "The Adviser will ***continually monitor***, directly or indirectly, the performance of the Manager in which such assets are invested and advise the Fund's Directors as to the appropriate changes in, or reallocation of assets.  The Manager is responsible for all the investment decisions, including asset allocations.  Such monitoring will be direct, by the Adviser, or indirect through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market."

(g)          "In structuring the portfolio for the Executive Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility."

(h)          "The Adviser will review on an ongoing basis the investment objective, restrictions and performance of Managers of the Fund to seek to ensure that a Manager does not invest more than 30% of the assets of the Select Fund with a single issuer . . ."

81. The Primeo Fund issued two subsequent supplements, on July 22, 2008 and October 20, 2008, to the Offering Memoranda (the "Primeo Supplements"). The Primeo Supplements omit any mention of the Primeo Fund's investment in Madoff and do not correct the false and misleading statements of either the 2004 Primeo Memorandum or the 2007 Primeo Memoranda.

82. On February 5, 2008, the Herald Luxemburg Fund issued a prospectus (the "Herald Prospectus"). The prospectus omits any mention of the Herald Fund's investment in Madoff and includes false and misleading statements including but not limited to:

(a) "The objective of the Fund is to achieve long-term capital appreciation through diversification of investments."

(b) "The Investment Manager believes that its investment activities attempt to moderate risk through diversification."

(c) "The Investment Manager, to whom the Board of Directors of the Fund has delegated under its responsibility such functions, employs a risk-management process which enables the monitoring and measurement at any time the risk of the positions and their contribution to the overall risk profile of each Sub-Fund."

83. On October 2, 2008, the Thema Fund issued a prospectus (the "Thema Prospectus"). The Thema Prospectus omits any mention of the Thema Fund's investment in Madoff and includes false and misleading statements including but not limited to:

(a) The cover of the Thema Prospectus states: "The Directors of the Company . . . are the persons responsible for the information contained in this Prospectus and accept responsibility accordingly. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information."

- 23 -

(b)      "The primary investment objective of the Company is to achieve long term capital appreciation while attempting to limit investment risk.  The Company will seek to achieve this objective on behalf of each Fund through the careful selection of investment advisers, which are, in the opinion of the Investment Manager, of the highest quality with a proven track record."

84.     PwC signed the prospectus containing those false and misleading statements.  "The Auditors have given and have not withdrawn their written consent to the issue of this Prospectus, together with their report and the references to it in the form and content in which it appears."

85.     The Thema Prospectus also stressed that delegation of the duties by the Thema Fund's financial advisers does not exempt them from their responsibilities.  For example, "the Custodian has full power to delegate the whole or part of its custodial functions provided that the Custodian's liability *shall not* be affected by the fact it has entrusted to a third party some or all of the assets in its safekeeping."

86.     On November 26, 2008 the Thema Fund issued a Prospectus Supplement (the "Thema Supplement").  The Thema Supplement omits any mention of the Thema Fund's investment in Madoff and includes false and misleading statements including but not limited to:

(a)      The cover of the Thema Supplement states: "The Directors of the Thema International Fund public limited company (the 'Company'), whose names appear under the heading 'Management and Administration' in the prospectus of the Company dated 2 October 2008 (the 'Prospectus') accept responsibility for the information contained in the Prospectus and this Supplement.  To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in the Prospectus and in this Supplement is in accordance with the facts and does not omit anything likely to affect the import of the information."

(b)    "The objective of the Thema Fund is to achieve long-term capital appreciation by investing on a non-leveraged basis in a large number of United States equity securities traded on Regulated Markets that are highly liquid.  Investments will principally be made in equity securities that are included in the Standard & Poors 100 Index (the 'Index')."

(c)    "In constructing the portfolio for the Thema Fund, the Investment Manager will attempt to minimise risk by choosing investments from a broad range of liquid securities and by taking into consideration various factors including the issuer, its performance and the industry in which it principally engages in business."

87.    Throughout the Class Periods, the Medici Funds would also disseminate fund performance updates.  As late as December 2008, a performance report showed consistent positive net returns for the first 11 months of 2008, even during the months of September, October, and November, when the stock market had taken a significant downturn.  In fact, the performance reports showed positive year-to-date net returns for years.  These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

88.    Despite the considerable fees charged to investors and the repeated representations that the Medici Funds would carefully select advisers, administrators, custodians and managers, Plaintiff's and the Class' funds were stolen through the Madoff Ponzi scheme.[1]  This could have

---

[1]    It is noteworthy that, on January 7, 2009, Ireland's Financial Regulator stated "All authorised funds must appoint a trustee with responsibility for custody of the assets.  Trustees may appoint sub-custodians.  However, this does ***not*** absolve the trustee of responsibility for the custody of the funds' assets."  To the same end, on January 2, 2009, Luxembourg's Commission de Surveillance du Secteur Financier stated "when a fund's assets are deposited by the depositary bank with a third party, these deposits are under the monitoring and supervisory responsibility of the depositary bank, implying that the latter must know at all times in which manner the assets are invested and where and how these assets are available.  This responsibility is ***not*** affected by the fact that the depositary has entrusted to a third party all or part of the assets in its safe-keeping."

been avoided if defendants had fulfilled their duties to Plaintiffs and the Class, if defendants had lived up to their own representations, and if defendants had adequately and reasonably investigated, monitored, and conducted due diligence of Madoff and BMIS.  Had defendants conducted due diligence, they would have discovered at least the multiple red flags identified herein.  At the very least, as described *infra*, like hedge fund investment advisors Aksia LLC, defendants should have been able to discover the existence of Markopolous' letter, which would put them on notice of the red flags identified therein.

89.     In failing to do so, defendants breached their legal duties to Plaintiffs and the Class, resulting in the complete loss of Plaintiff's and the Class' investments.  At the same time, defendants paid themselves millions of dollars in fees, predicated on phony profits.

**Red Flags Defendants Would Have Uncovered Had They Performed Reasonable Due Diligence**

90.     According to a December 19, 2008 *Bloomberg* article, U.S. government regulators investigating Madoff found evidence that the scheme began at least as early as the 1970s.  For years since the scheme's inception, there have been a myriad of warnings that would have been meaningful to defendants, had they been conducting proper due diligence, but unavailable to Plaintiffs and the Class, as they were unaware their investments in the Medici Funds were being sent to Madoff's Ponzi scheme.  Some of the red flags are discussed in the paragraphs that follow.

91.     In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns of 13.5% to 20%, and invested the money entirely with Madoff.  As a result of the Securities and Exchange Commission ("SEC") investigation, Avellino and Bienes agreed to shut down their business and reimburse their clients.

- 26 -

92.     In May 1999, Harry Markopolos a derivatives expert with experience managing split-strike conversion strategies, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

93.     By May 2001, defendants knew or were reckless in not knowing that significant questions had surfaced about Madoff's so-called split-strike conversion strategy.  The hedge fund world was baffled by the way Madoff had obtained such consistent, nonvolatile returns month after month and year after year.  Many questioned the consistency of the returns, including current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives.  Others who had used the ***split-strike conversion*** strategy were known to have had nowhere near the same degree of success.  The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period.

94.     In addition, experts were asking why no one had been able to duplicate similar returns using the strategy and why other firms on Wall Street hadn't become aware of the fund and its strategy and traded against it, as had happened so often in other cases.  When pressed at the time to truly explain the basis of the split-strike conversion strategy, Madoff stated, "'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

95.     Also, by May 2001, defendants knew or were reckless in not knowing that certain option strategists for major investment banks could not understand how BMIS and Madoff achieved the results they claimed with their purported investment strategy.  Madoff responded by stating, "'It's a proprietary strategy.  I can't go into great detail.'"

96.     Markopolos again provided an analysis to the SEC on November 7, 2005, warning that Madoff was running a Ponzi scheme.  In his over 17 page single spaced letter entitled "The

World's Largest Hedge Fund is a Fraud," Markopolos asserted that the consistency of Madoff's positive returns was mathematically impossible, stating that it was "highly likely" that "Madoff Securities is the world's largest Ponzi Scheme."

97.     Markopolos's analysis further stated as follows:

At my best guess level of BM's assets under management of $30 billion, or even at my low end estimate of $20 billion in assets under management, BM would have to be over 100% of the total [S&P 100] put option contract open interest in order to hedge his stock holdings as depicted in the third party hedge funds marketing literature [*e.g*., the Optimal Memorandum].  In other words, there are not enough index option put contracts to hedge the way BM says he is hedging[.]  And there is no way the OTC market is bigger than the exchange listed market for plain vanilla S&P 100 index put options.

One hedge fund . . . has told that BM uses Over-the-Counter options and trades exclusively thru [sic] UBS and Merrill Lynch. . . .

The counter-party credit exposures for UBS and Merrill Lynch would be too large for these firms [sic] credit departments to approve.  The SEC should ask BM for trade tickets showing he has traded OTC options thru [sic] these two firms.  Then the SEC should visit the firms' OTC derivatives desk, talk to the heads of trading and ask to see BM's trade tickets.

*     *     *

It is mathematically impossible for a strategy using index call options and index put options [as described by Madoff] to have such a low correlation to the market where its returns are supposedly generated from. . . .  BM's [Bernard Madoff's] performance numbers show only 7 extremely small [monthly] losses during 14.5 years . . . .

*     *     *

[S]ince Madoff owns a broker-dealer, he can generate whatever trade tickets he wants. . . .  [H]ave the [feeder funds] matched [the trade tickets] to the time and sales of the exchanges?  For example, if BM says he bot [sic] 1 million shares of GM, sold $1 million worth of OTC OEX calls and bot [sic] $1 million worth of OTC OEX puts . . . the GM share prints would show on either the NYSE or some other exchange while the broker-dealers he traded OTC options thru [sic] would show prints of the hedges they traded to be able to provide BM with the OTC options at the prices listed on BM's trade tickets.

Madoff does not allow outside performance audits.  One London based hedge fund . . . asked to send in a team of Big 4 accountants to conduct a performance audit

- 28 -

during their planned due diligence.  They were told "No, only Madoff's brother-in-law who owns his accounting firm is allowed to audit performance for reasons of secrecy in order to keep Madoff's proprietary trading strategy secret so that nobody can copy it."

*       *       *

Madoff is suspected of being a fraud by some of the world's largest and most sophisticated financial services firms.  Without naming names, here's an abbreviated tally:

> A.   A managing director at Goldman, Sachs prime brokerage operation told me that his firm doubts Bernie Madoff is legitimate so they don't deal with him.

*       *       *

> [Royal Bank of Canada] and [Societe Generale] have removed Madoff some time ago from approved lists of individual managers . . . .

> Madoff was turned down . . . for a borrowing line from a Euro bank. . . .  Now why would Madoff need to borrow more funds? . . . Looks like he is stepping down the payout.

*       *       *

BM tells the third party FOF's [fund of funds] that he has so much money under management that he's going to close his strategy to new investments.  However, I have met several FOF's who brag about their "special access" to BM's capacity. This would be humorous except that too many European FOF's have told me this same seductive story about their being so close to BM that he'll waive the fact that he's closed his funds to other investors but let them in because they're special.  It seems like every single one of these third party FOF's has a "special relationship" with BM.

98.     Had defendants conducted reasonable and adequate due diligence, they would have detected the fraud based on the red flags and glaring inconsistencies identified by Markopolos.  In fact, given that the Medici Funds had provided Madoff with billions of dollars in assets, defendants had considerably more access than Markopolos to Madoff's operations to detect these red flags.  For example, one of Markopolos's critical tests was the confirmation with the supposed counterparties of the trades Madoff claimed to have executed.  But, as reported by the *Associated Press* on January 16,

- 29 -

2009, in an article entitled "Madoff fund may have made no trades," "[T]he securities and brokerage industry self-policing organization, the Financial Industry Regulatory Authority, confirmed that there was no evidence of Madoff's secretive investment fund executing trades through its brokerage operation. And Fidelity Investments, which had a money-market fund listed among the many trades included in statements Madoff's fund sent to customers, says Madoff was not a client." Defendants' minimal and reasonable inquiries with Fidelity, or other similar counterparties, would have alerted defendants to the fraud.

99.     Markopolos's obvious questions about the legitimacy of Madoff's enterprise were echoed by other finance professionals. In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff. Aksia identified the following red flags:

(a)     Aksia discovered the 2005 letter from Markopolos to the SEC set forth above.

(b)     Madoff's auditor, Friehling & Horowitz ("F&H"), was a three-person accounting firm located in a 13-by-18 foot office in Munsey, New York. A financial institution of the size of BMIS is typically audited by a big-four accounting firm, or one of the other larger and more reputable auditors. In addition, while F&H purportedly audited BMIS, F&H had filed annual forms with The American Institute of Certified Public Accountants ("AICPA") attesting that it had not performed audits for the past fifteen years. The AICPA has begun an ethics investigation into F&H. Federal investigators have issued a subpoena to F&H and have requested documents going back to 2000.

(c)     The comptroller of BMIS was based in Bermuda. Most mainstream hedge fund investment advisers have their comptroller in house.

(d)     BMIS had no outside clearing agent that could confirm its trading activity.

100.   Societe Generale ("SocGen") sent a due diligence team to New York in 2003 to investigate Madoff.  As reported by *The New York Times* on December 17, 2008, in an article entitled "European Banks Tally Losses Linked to Fraud," SocGen concluded that something was not right.   "'It's a strategy that can lose sometimes, but the monthly returns were almost all positive' . . . ."

101.   On December 12, 2008 Robert Rosenkranz, a principal at Acorn Partners, an investment advisory firm, stated: "'Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity' . . . ."

102.   Jeffrey S. Thomas, Chief Investment Officer at Atlantic Trust, which manages $13.5 billion, said that it had "reviewed and declined to invest with Madoff."  The firm said it spotted a number of "red flags" in Madoff's operation, including a lack of an outside firm to handle trades and accounting for the funds and the inability to document how Madoff made profits.

103.   In contrast to the above-quoted experts, defendants here entrusted Madoff with more than $3 billion of the Class's assets without conducting any reasonable due diligence.

**The Truth Is Revealed**

104.   Madoff was arrested on December 11, 2008 and charged with criminal securities fraud after admitting that his money management operations were "all just one big lie," and "a giant Ponzi scheme."  Madoff also admitted that "there [was] no innocent explanation" and estimated investors' losses at $50 billion.

105.   The same day, the SEC filed an emergency action in this Court to halt all ongoing fraudulent activities by Madoff and BMIS.  That action is *SEC v. Bernard L. Madoff*, 08 Civ. 10791-LLS (S.D.N.Y. Dec. 11, 2008).

106.    The Thema Fund issued a notice of suspension on December 15, 2008, and subsequent press release regarding the same on December 17, 2008.  The notice of suspension stated:

> Following the recent events surrounding the investigation of Bernard L Madoff Investment Securities LLC ("Madoff"), ***the Company's custodian has not been able to obtain confirmation regarding the safe custody of the Company's assets.  All assets as were held by Madoff on 13 December 2008 have now been frozen by court order in the U.S. In this position, the Company had no alternative, in the interests of shareholders, but to suspend dealings and the calculation of its net asset value in the Thema Fund and did so with effect from 14 December 2008*** in accordance with the terms of the Company's memorandum and articles of association and prospectus.  The Company is working with its advisors and service providers to clarify the situation and to take such measures to protect the assets of the Thema Fund as it deems appropriate, including the suspension of all foreign exchange positions.

107.    On December 17, 2008, the Primeo Fund announced it would cease calculating NAV and suspend both new share issuance and redemption of any existing shares with effect from December 12, 2008.

108.    On or about December 19, 2008, the Herald Funds announced they would cease calculating NAV and that investor redemptions had been suspended.

109.    On January 2, 2009, Austria's financial regulatory authority, known as the Financial Market Authority, took control of Medici.  That same day, Medici's board resigned.

110.    On January 23, 2009, the Primeo Fund announced that it would seek voluntary liquidation of the Primeo Fund (including its two sub-funds, Primeo Select and Primeo Executive). The Primeo Fund also provided the following background:

> Primeo Select aims to achieve long-term growth by investing with one or more underlying managers of their funds that may, in turn, appoint and use one or more sub-managers to invest Primeo Select's assets.  Primeo appointed Pioneer Alternative Investment Management Limited (the Adviser or PAI) as investment manager to assist Primeo in choosing on behalf of Primeo Select which managers or their funds to invest in.  All of Primeo's three current directors are affiliated with the Adviser or its affiliates.

In accordance with its stated investment approach, Primeo Select invested in the investment fund of one manager: Herald Fund SPC, an exempted segregated portfolio company incorporated in the Cayman Islands and registered as a regulated mutual fund under Cayman Islands law (Herald), which is managed by Herald Asset Management. Herald selected BMIS as sub-manager to manage the assets of its fund.

## COUNT I

### Violation of §10(b) of the 1934 Act
### (Against all Defendants)

111.    Plaintiffs repeats the allegations set forth above.

112.    Defendants violated §10(b) and Rule 10b-5 by:

    (a)    Employing devices, schemes, and artifices to defraud;

    (b)    Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (c)    Engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiffs and the Class in connection with their purchase or acquisition of Medici Funds.

113.    In reliance on the integrity of the market, Plaintiffs and the Class paid artificially inflated prices for their shares of the Medici Funds that were fed into Madoff during the Class Periods and were unable to recover this inflation after the fraud was revealed, and were thereby damaged. Plaintiffs and the Class would not have purchased these investments at the prices they paid, or at all, if they had been aware that their money was being sent by defendants to Madoff and BMIS and that defendants had failed to perform the due diligence promised in the prospectus and offering memoranda.

114.    The undisclosed adverse information concealed by defendants during the Class Periods is the type of information which, because of SEC regulations, regulations of the national

stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**COUNT II**

**Pursuant to Section 20(a) of the 1934 Act**
**(Against Certain Defendants)**

115.    Plaintiffs repeat the allegations set forth above.

116.    Medici was a control person within the meaning of §20(a) of the 1934 Act as alleged herein for the Medici Funds.  By virtue of its position in these funds, participation in and/or awareness of their operations and/or intimate knowledge of their internal financial condition and business practices, Medici had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Medici Funds, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

117.    Bank Austria was a control person of Medici.  By virtue of its ownership interest in Medici, participation in and/or awareness of its operations and/or intimate knowledge of its internal financial condition and business practices, Bank Austria had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Medici.

118.    Kohn, Scheithauer, Tripolt, and Holliwell were also control persons of Medici.  Due to their high corporate positions, participation in and/or awareness of Medici's operations and/or intimate knowledge of its internal financial condition and business practices, Kohn, Scheithauer, Tripolt, and Holliwell had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Medici.

119.    The   Herald   Luxembourg   Director   Defendants,   and   Herald   Funds Administrator/Custodian had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Herald Funds.

120.    Pioneer, the Primeo Director Defendants, Primeo Adviser Defendants, Primeo Administrator, First Primeo Custodian, Second Primeo Custodian, Bank of Bermuda Limited, HSBC and Herald SPC had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Primeo Fund.

121.    The Thema Director Defendants, Thema Administrator, Thema Custodian, and HSBC had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Thema Fund.

122.    As set forth above, the defendants violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.

123.    As a direct and proximate result of the wrongful conduct of defendants, plaintiffs and other members of the Class suffered damages in connection with their purchase of the Herald, Primeo, and Thema Funds.

### COUNT III

### Negligent Misrepresentation
### (Against All Defendants)

124.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

125.    The defendants owed to Plaintiffs and the Class a duty:  (a) to act with reasonable care in preparing and disseminating the information set forth in written materials, including the prospectuses and offering memoranda, the monthly account statements, and other representations

relied upon by Plaintiffs and the Class in deciding to purchase and retain the investments; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained therein.

126.    The defendants breached their duty to Plaintiffs and the Class by failing to investigate, confirm, prepare, and review with reasonable care the information contained in the written materials and other representations and by failing to disclose to Plaintiffs and the Class, among other things, the facts alleged above, and in failing to correct the misstatements, omissions, and inaccuracies contained therein.

127.    As a direct, foreseeable, and proximate result of this negligence, Plaintiffs and the Class have sustained damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

128.    By reason of the foregoing, the defendants are jointly and severally liable to Plaintiffs and the Class.

## COUNT IV

### Breach of Fiduciary Duty
### (Against All Defendants)

129.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

130.    Defendants owed fiduciary duties to the Plaintiffs and the Class and breached such duties.

131.    The duties expressly assumed by defendants and owed to the Plaintiffs and the Class include, *inter alia*:

(a)    The duty to act with reasonable care to ascertain that the information set forth in the written materials, including the monthly account statements, and other presentations communicated to and relied upon by Plaintiffs and the Class in deciding to purchase the investments, was accurate and did not contain misleading statements or omissions of material facts;

(b)    The duty to allow individual representatives selling the investments to act with reasonable care to ascertain that the investment opportunity presented to Plaintiffs and the Class was suitable and in accordance with their investment goals and intentions by providing to such representatives truthful sales information concerning such investments;

(c)    The duty to deal fairly and honestly with Plaintiffs and the Class;

(d)    The duty to avoid placing themselves in situations involving a conflict of interest with Plaintiffs and the members of the Class;

(e)    The duty to manage the accounts of Plaintiffs and the members of the Class and to manage, monitor, and operate the investments exclusively for the best interest of the Plaintiffs and the members of the Class; and

(f)    The duty to make recommendations and execute transactions in accordance with the goals, investment objectives, permissible degree of risk, and instructions of Plaintiffs and the members of the Class.

132.    Defendants failed to fulfill their fiduciary duties owed to Plaintiffs and the members of the Class in the following respects:

(a)    Failing to act with reasonable care to ensure that the information set forth in the written materials and other presentations communicated to and relied upon by Plaintiffs and the other members of the Class in deciding to purchase the investments was accurate and did not contain misleading statements or omissions of material facts;

(b)      Failing to act with reasonable care to provide truthful sales information to representatives' agents to ensure that the investment opportunity presented to Plaintiffs and the Class was suitable and in accordance with their investment goals and intentions;

(c)      Engaging in transactions which resulted in a conflict of interest between the defendants and Plaintiffs and the Class whose financial interests the defendants had undertaken to advance, supervise, manage, and protect;

(d)      Failing to adequately and fully disclose to Plaintiffs and the Class the full extent and nature of the conflicts of interest in which the defendants and their affiliates would be engaging;

(e)      Profiting and allowing all defendants and their affiliates to profit at the expense of Plaintiffs and the Class;

(f)      Engaging in transactions that were designed to and did result in a profit to all defendants and their affiliates at the expense of Plaintiffs and the Class; and

(g)      Failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds.

133.    The acts of the defendants in breaching their fiduciary obligations owed to Plaintiffs and the members of the Class show a willful indifference to the rights of Plaintiffs and the other members of the Class.

134.    As a proximate result of defendants' breaches of their fiduciary duties, Plaintiffs and the other Class members have sustained damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

135.    By reason of the foregoing, defendants are jointly and severally liable to Plaintiffs and the other Class members.

136.    In addition, defendants' acts were willful and wanton and aimed at the public generally.  Therefore, Plaintiffs and the Class are entitled to punitive damages.

### COUNT V

### Violations of General Business Law § 349
### (Against All Defendants)

137.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

138.    Defendants' acts and conduct in furtherance of their scheme or artifice constitute deceptive acts and practices in the conduct of a business or in the furnishing of a service, within the meaning of § 349 of the New York General Business Law and, as such, are unlawful.

139.    Upon information and belief, the same acts and conduct used by defendants to defraud Plaintiffs have been used repeatedly and are of a recurring nature.

140.    The acts and conduct of defendants, by which they knowingly fraudulently represented to potential purchasers the nature of the investments that defendants were selling to Plaintiffs, affect the public interest.

141.    As a result of defendants' unlawful acts and conduct in violation of § 349 of the New York General Business Law, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

### COUNT VI

### Gross Negligence
### (Against All Defendants)

142.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This Count is asserted against all defendants.

143.    As investment managers with discretionary control over the assets entrusted to them by Plaintiffs and the Class, defendants owed Plaintiffs and the Class a duty to manage and monitor the investments of Plaintiffs and the Class with reasonable care.  Defendants breached this duty.

144.    Defendants further breached their duty of care by failing to:

(a)    Take all reasonable steps to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(b)    Take all reasonable steps to preserve the value of Plaintiff's and the Class's investments;

(c)    Perform all necessary and adequate due diligence; and

(d)    Exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

145.    As a direct and proximate result of defendants' gross negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from defendants, jointly and severally.

### COUNT VII

### Unjust Enrichment
### (Against All Defendants)

146.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This Count is asserted against all defendants.

147.    Defendants financially benefited from their unlawful acts which caused Plaintiffs and the Class to suffer injury and monetary loss.

148.    As a result of the foregoing, it is unjust and inequitable for defendants to have enriched themselves in this manner, and each defendant should pay its own unjust enrichment to Plaintiffs and the Class.

149.    Plaintiffs and the Class are entitled to the establishment of a constructive trust over the benefits defendants realized from their unjust enrichment and inequitable conduct.

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty
### (Against PwC and E&Y)

150.    Plaintiffs incorporates by reference and reallege the paragraphs above.

151.    Defendants owed Plaintiffs and the Class certain fiduciary duties as alleged herein.

152.    By committing the acts alleged herein, Defendants have breached their fiduciary duties owed to Plaintiffs and the Class.

153.    Defendants PwC and E&Y aided and abetted the other defendants in breaching their fiduciary duties owed to Plaintiffs and the Class.  PwC and E&Y colluded with or aided and abetted the other defendants' breaches of fiduciary duties, and was an active and knowing participant in the the breaches of fiduciary duties owed to Plaintiffs and the Class.  Among other things, PwC and E&Y knowingly or recklessly ignored information that indicated or should have indicated that the money invested by Plaintiffs and the Class in the Medici Funds was being invested with Madoff and BMIS and that Madoff and BMIS were involved in a Ponzi scheme.

154.    Plaintiffs and the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class, demands judgment against defendants as follows:

A.    Enjoining defendants from contacting Class members in an attempt to settle their claims through coercive and inadequate offers and through deceptive representations and in-person solicitations;

B.      Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs proper Class representatives;

C.      Awarding damages suffered by Plaintiffs and the Class as a result of the wrongs complained of herein, together with appropriate interest.  Plaintiffs and the Class specifically seek the recovery not only of all the principal initially invested through the defendants, but also all interest and profits which Plaintiffs and the Class would have earned had their money been prudently invested;

D.      Awarding Plaintiffs and the Class punitive damages, where appropriate;

E.      Enjoining defendants from using the Medici Funds' assets to defend this action or to otherwise seek indemnification from the funds for their wrongful, deceitful, reckless, and negligent conduct as alleged herein;

F.      Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: March 19, 2009                    MURRAY, FRANK & SAILER LLP


                                         _____ S/ _____
                                         BRIAN MURRAY (BM 9954)
                                         bmurray@murrayfrank.com
                                         275 Madison Avenue, Suite 801
                                         New York, New York  10016-1101
                                         Telephone:   (212) 681-1818
                                         Facsimile:    (212) 682-1892

                                         JOHNSON BOTTINI, LLP
                                         FRANCIS A. BOTTINI, JR.
                                         655 W. Broadway, Suite 1400
                                         San Diego, CA  92101
                                         Telephone: 619.230.0063
                                         619.233.5535 (fax)

                                         Attorneys for Plaintiffs

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Fabian Perrone, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint on file in this case with my counsel, Johnson Bottini LLP, whom I designate as my counsel in this action for all purposes.

2.      I did not acquire the securities that are the subject of this action at the direction of my counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses - such as lost wages and travel expenses - directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.      My purchases and sales of the securities during the Class Period are listed in Exhibit 1 to this declaration.

1

8.      I declare under the laws of the United States of American and penalty of perjury that the foregoing Is true and correct.

Executed this __10__ day of March, 2009.

**FABIAN PERRONE**

2

## EXHIBIT 1

## PURCHASES AND SALES OF THE SECURITIES OF THE THEMA FUND, HERALD FUND, PRIMEO FUND, AND PIONEER FUND BETWEEN MARCH 1, 2001 AND DECEMBER 10, 2008

| DATE | PURCHASED OR SOLD? | NAME OF FUND PURCHASED | NUMBER OF SHARES | PRICE |
|---|---|---|---|---|
| 2.002 | PURCHASE | THEMA INTERNATIONAL | 447.449 | AVERAGE APR. 225.000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

3

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Chia-Hung Kao, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      Attached as **Exhibit 1** are my transactions during the Class Period in the securities that are the subject of this action.

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses -- directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _7th_ day of March, 2009.

_Chia-Hung Kao_

**CHIA-HUNG KAO**

**EXHIBIT 1**

**PURCHASES AND SALES OF PRIMEO SELECT FUND**

| NUMBER OF SHARES | PURCHASED OR SOLD? | DATE | AMOUNT INVESTED | CURRENCY (*e.g.*, U.S. DOLLARS, EUROS, ETC.) |
|---|---|---|---|---|
| 2,805.83 | PURCHASED | July 1, 2008 | 100,000 | U.S. DOLLARS |
| 2,738.97 | PURCHASED | Oct. 1, 2008 | 100,000 | U.S. DOLLARS |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |